**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASSOCIATION OF THE | ) | |
| UNITED STATES ARMY | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:03-206 |
| | ) | |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| AEGIS CONSULTING GROUP, INC. | ) | |
| and THE ABERJONA PRESS | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**Gibson, J.,**

This litigation emerges from the breakdown of a planned book publishing arrangement in a specialized field of military history. Of particular importance, the parties' relationship was not governed by an effective and clear contract, the absence of which likely affected the parties' own perceptions of their benefits and responsibilities under the arrangement. More importantly now, though, the lack of any definiteness in an essential term relating to the parties' putative contractual relationship precludes the Court, at the summary judgment stage, from presently finding that a valid contract existed; consequently, and also because of the presence of nearly innumerable disputed facts, the Court will deny both parties' requests for summary judgment.

Specifically before the Court now are the Parties' cross-motions for summary judgment, related briefing, and extensive supporting documents. On August 17, 2007, Defendants Aegis Consulting Group, Inc. and the Aberjona Press (collectively "Aegis" or "Defendant") filed a Motion for Summary Judgment (Doc. No. 40), seeking judgment in their favor, and endeavoring to foreclose

the claims brought in Plaintiff Association of the United States Army's ("AUSA" or "Plaintiff") Complaint (Doc. No. 1). On August 18, 2007, AUSA filed a Motion for Summary Judgment (Doc. No. 57) seeking judgment in its favor and the dismissal of the Defendant's counterclaims. As noted, because this matter is not presently appropriate for summary adjudication, both Motions will be denied.

## I. JURISDICTION AND VENUE

Jurisdiction is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. §§ 1331, 1332 and 1338. AUSA is a District of Columbia Corporation with its principal place of business in Virginia. Aegis is a Pennsylvania corporation with its principal place of business in Pennsylvania. The amount in controversy exceeds $75,000.00, exclusive of interests and costs. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2).

## II. INTRODUCTION AND BACKGROUND

AUSA is a private educational organization that provides educational services and products, especially to members and retirees of the Army and others. Since approximately 1950, AUSA has used a logo that incorporates the phrase "Association of the United States Army" in a circular pattern around a depiction of an eagle holding a shield and olive branch. Aegis is a publishing house that markets some of its books under the title Aberjona Press. Aegis publishes historical and military literature. At some point in the Spring of 2002, the parties initiated discussions about entering into a marketing and publishing agreement. At various points later in 2002, these discussions led to the production of two written documents that purported to describe the parties' plans and relationship.

2

Initially, like most business entities, both parties obviously intended their relationship to be mutually beneficial. Essentially, the intention was for Aegis to prepare and publish books from manuscripts provided by AUSA, with AUSA assisting in marketing those books. The parties also established rudimentary plans for royalties and cross-promotions. In view of this intended relationship, AUSA advanced $50,000 to Aegis.

Shortly following the hopeful creation of these initial plans, for myriad reasons, the relationship disintegrated. While both parties completed limited efforts at cross-promotion, the central thrust of the parties' agreement, preparing and publishing books, did not come to fruition. Each party blames the other for this lapse: Aegis claims that appropriate books were not delivered; AUSA claims that it delivered sufficient material, but that Aegis proved itself insufficiently capable of handling certain book projects. Regardless, communications deteriorated into mixtures of threats, demands and blame. AUSA criticizes Aegis' failure to publish any AUSA books, and Aegis' failure to pay royalties owed, and Aegis' continued use of the AUSA logo on certain books without permission. Meanwhile, Aegis criticizes AUSA's supposed failure to provide it with adequate manuscripts in accordance with the parties' agreement. In particular, the issue of the $50,000 advance became a problem between the entities. AUSA demanded that the advance be returned; Aegis refused, arguing that it was entitled to retain the advance, because AUSA breached the parties' agreement.

On September 11, 2003, AUSA filed a Complaint, outlining the following claims: Count I–Breach of Contract (the Memorandum of Understanding); Count II–Breach of Contract (the Outline Agreement); Count III–Unjust Enrichment; Count IV–Promissory Estoppel; Count V–Conversion; Count VI–False Designation of Origin/Unfair Competition; and Count VII–Common

3

Law Trademark Infringement and Unfair Competition. Doc. No. 1. AUSA seeks the following remedies: damages for breach of contract, a permanent injunction preventing Aegis from using the AUSA mark, and a decree ordering destruction of any materials bearing the mark in the possession of Aegis.

On November 5, 2003, Aegis filed an Answer and Counterclaim, bringing the following claims against AUSA: Count I–Breach of Contract; Count II–Unjust Enrichment; Count III–Promissory Estoppel; Count IV–Fraudulent Misrepresentation; and Count V–Breach of the Implied Covenant of Good Faith and Fair Dealing. Doc. No. 4. Aegis seeks the following remedies: "monetary damages, interest, costs, expenses, attorneys' fees, and such other relief as this [C]ourt deems just and proper." Doc. No. 4.

## III. FACTUAL SETTING

Aegis began operations in 1997 and published its first book in 1999. Doc. Nos. 60 and 69, ¶ 1. As of August 2007, Aegis had been in business for 10 years and listed thirteen books for sale on its website. *Id.* ¶ 3. In the Spring of 2000, the parties began discussing entering into a publishing relationship. *Id.* ¶ 4. Aegis acknowledges that at that time, it was "struggling financially." *Id.* ¶ 5. On or about May 1, 2001, Aegis and AUSA entered into what the parties refer to as a contract. Docs. *Id.* ¶ 6. While AUSA claims that both parties agree that the Outline itself represents the valid contract between the parties, Aegis claims that the parties' "contract" was memorialized by the Outline Agreement, the Stroup letter of May 8, 2001, and the Memorandum of Understanding. *Id.* ¶ 8.

### Summary of the Outline Agreement

The Outline included several agreements between the parties.

4

(1) The Outline dictated that AUSA would permit Aegis to use the AUSA name on certain books. *Id.* ¶ 9. The parties disagree as to which party this name licensing arrangement was intended to benefit. *Id.* ¶ 10.

(2) The parties agreed to designate five books as "AUSA books" subject to the terms of the Outline. *Id.* ¶ 11.

(3) The Outline states that AUSA will "provide manuscripts from its holding of unpublished official studies concerning military history, and also act as a go-between for new authors dealing with topics of mutual interest to AUSA-AEGIS." *Id.* ¶ 12. The parties disagree as to whether AUSA provided such manuscripts in accordance with the terms of the parties' agreement. *Id.* ¶ 13.

(4) The Outline states that AUSA will "offer specialized German manuscripts in AUSA's ownership." Docs. No. 60 and 69, ¶ 14. The parties disagree as to whether appropriate manuscripts were so offered. *Id.* ¶ 14.

(5) The Outline states that AUSA will "provide a hot-link from its web-site to Aegis website for ease of customer service." *Id.* ¶ 15. The parties agree that this term was successfully completed. *Id.* ¶ 15.

(6) The Outline states that AUSA will "provide a formal announcement of our agreement on the AUSA website." *Id.* ¶ 16. The parties agree that this term was successfully completed. *Id.* ¶ 16.

(7) The Outline states that AUSA will "list Aegis book discounts as part of its member benefits mail-outs." *Id.* ¶ 17. The parties agree that this term was successfully completed. Docs. *Id.*

(8) The Outline states that AUSA will provide book review space for new AUSA

5

books in two AUSA-owned periodicals sent to AUSA members. *Id.* ¶ 18. The parties agree that this term was successfully completed. *Id.* ¶ 19.

(9) Any book termed an "AUSA book" was subject to a 3% sales royalty payable by Aegis to AUSA. Docs. *Id.* ¶¶ 20, 26. Aegis admits that it has sold copies of such books, but has not paid any royalties for these sales to AUSA. *Id.* ¶ 24, 27, 28. The parties agree that the amount of royalties that would have accrued through February 25, 2002 was $2,133.48. *Id.* ¶ 29. Aegis argues that this amount is not owed due to AUSA's breach of the contract. *Id.* ¶ 31.

(10) The Outline states that Aegis will "assist AUSA in promoting the books sold as AUSA/Aberjona books as mutually agreed upon." Docs. No. 60 and 69, ¶ 21. AUSA advertised several such books in its publications. *Id.* ¶ 22.

The parties disagree as to whether AUSA performed its obligations under the terms of the Outline with respect to promotion of books. *Id.* ¶ 25.

**The Stroup Letter**

At approximately the time of the Outline agreement, *Id.* ¶ 34, AUSA Vice-President Stroup sent a letter to Aegis, dated May 8, 2001. *Id.* ¶ 33. Aegis argues that the Stroup letter, along with the Outline Agreement and the Memorandum of Understanding, together constitute a proper memorialization of the parties' contract. *Id.* ¶ 33. AUSA argues that the letter's sole purpose was to allow Aegis to demonstrate its publishing relationship with AUSA to potential investors. Doc. No. 60, ¶ 33.

**The Memorandum of Understanding**

On or about May 24, 2001, AUSA and Aegis entered in an agreement entitled Memorandum of Understanding ("MOU"). *Id.* ¶ 35. Aegis asserts that the Memorandum of Understanding is a

6

partial memorialization of the parties' contract. *Id.* ¶ 35. The MOU includes the following terms:

(1) The MOU states that AUSA will provide a $50,000 advance to Aegis. that "AUSA will advance funds for the publication of books if specific conditions are met." *Id.* ¶ 37. The funds provided "will be a re-payable book advance and not an investment in stock etc." *Id.* ¶ 38.

(2) The parties admit that the MOU contains an agreement that Aegis will publish four books within one year of receiving the $50,000 advance. *Id.* ¶ 40. However, the parties disagree as to the nature of that agreement and the books it encompassed. *Id.* ¶ 40.

(3) On or about May 29, 2001, AUSA advanced Aegis $50,000. *Id.* ¶ 41.

(4) The MOU states that AUSA would review each book, advertise the book on its website, provide a link to Aberjona on its website, and publicize the Aegis series in one of its newsletters. *Id.* ¶ 40.

(5) The MOU states that "in return for the temporary use of funds [Aegis] GUARANTEES publication of four AUSA owned books during the 12 months following the receipt of funds from AUSA." *Id.* ¶ 43.

(6) The MOU states that "Aegis agrees to repay all funds, and any royalties due, should non-publication of the four books occur within 90 days of defaulting on publication." *Id.* ¶ 44.

(7) The MOU states that books "selected for publication will be made by mutual agreement between the representatives of both parties." *Id.* ¶ 45.

(8) The MOU does not include any description of the type of books that will be published under its terms. *Id.* ¶ 46. AUSA claims that the only requirement listed in the MOU regarding which books would be published is mutual agreement. *Id.* ¶ 57. However, Aegis claims

7

that matter was "thoroughly addressed" in other material and correspondence. *Id.* ¶¶ 46, 57.

(9) The MOU sets forth a detailed schedule for repayment of the advance following publication of each book. *Id.* ¶ 47.

### The Korean War Book

AUSA and Aegis agreed that Aegis would publish a book on the Korean War. *Id.* ¶ 64. On or about December 15, 2001, AUSA delivered to Aegis a book-ready manuscript. *Id.* ¶ 50. Aegis never published the book. *Id.* ¶ 65. Aegis contends that this book was outside of the contract, and it only agreed to publish it as a favor. *Id.* ¶ 50. Aegis further contends that AUSA's other publishers had refused to publish this book. *Id.* ¶ 50. Aegis only performed a limited amount of organizational preparatory work on this book. *Id.* ¶ 52. Aegis and AUSA disagree about the circumstances, reasons, and blame for the lack of progress in publishing the book. *Id.* ¶¶ 53-56, 65.

### Military Manuscripts

AUSA states that at the time of its agreement with Aegis, AUSA owned the rights to military manuscripts referenced in the Outline; Aegis disagrees. *Id.* ¶ 58. Aegis's Keith Bonn saw some of the manuscripts. *Id.* ¶ 59.

### Content of Combat Leader Series

The parties disagree as to the content of the Combat Leader series; AUSA claims that the Korean War manuscripts were part of the Combat Leader Series. *Id.* ¶ 63.

### Lack of Publications/ Refusal to Return Advance/ Refusal to Return Korean War book

Aegis refuses to return the $50,000 advance. *Id.* ¶ 69. AUSA claims that Aegis used the advance to publish other books with other partners; Aegis denies this charge. *Id.* ¶ 69. Aegis also refuses to return the Korean War manuscript. *Id.* ¶ 71.

Also of note, AUSA provided book reviews to Aegis. Doc. Nos. 60 and 69, ¶ 72. Additionally, the Outline required Aegis to display the AUSA logo on certain books. *Id.* ¶ 76. Aegis claims that AUSA has not presented any evidence that it holds a trademark, or that the use of the AUSA logo has caused public confusion or deceived the public. Doc. No. 69, pp. 12-13.

Furthermore, the parties agree that there were no written predictions or guarantees as to how many book sales would be made to AUSA members. Doc. Nos. 60 and 69, ¶¶ 77, 78.

### Dissolution of Relationship

On or about June 17, 2002, AUSA sent a letter to Aegis requesting the return of the advance and the termination of the parties' agreement. *Id.* ¶ 79. Aegis refused this request, responding that it was ready and willing to publish the agreed-upon books. *Id.* ¶ 90. Shortly thereafter, AUSA instructed Aegis to stop using AUSA's logo on any of Aegis's books. *Id.* ¶ 81. Aegis continued to sell the stock of Aegis books that were already published. *Id.* ¶ 82. Aegis informed AUSA that it would not return the $50,000 advance or the Korean War manuscript. *Id.* ¶ 83.

As represented by the parties, while the parties agree that there was a contract between them, they disagree as to what its terms were, what documents form the foundation of the contract, and whether such terms were fulfilled.

## IV. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment will not be defeated by the mere

9

existence of some disputed facts, but will be defeated when there is a disputed genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202, 211-12 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249, 106 S. Ct. at 2511, 91 L. Ed. 2d at 212. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party."). In *El*, the United States Court of Appeals for the Third Circuit explained:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

## V. DISCUSSION

In their summary judgment briefs, both parties detail numerous arguments and allegations; furthermore, both parties have felt it necessary to attach nearly innumerable documents as exhibits, without carefully selecting the relevant pages of such documents. Still, the parties largely spend insufficient energy addressing a threshold issue in this matter: the precise nature and legal effect of the parties' agreement. Rather, the parties serially refer to the miscellaneous agreements within their relationship as contracts. *See, e.g.*, Doc. No. 61, p.12 ("There is no factual dispute that the parties entered into a contractual agreement on or about May 1, 2001 . . . ."). This statement apparently suggests or presumes that the parties themselves may make the post-hac determination that their

10

miscellaneous interactions constituted a legally enforceable contract;[1] because the Court disagrees with this assumption, or, more accurately, because the Court finds that numerous substantial factual disputes must be resolved prior to determination of whether a legally enforceable contract actually exists, the Court will deny both motions for summary judgment of this matter. The matter will be scheduled for trial, wherein the parties will be allowed to present additional evidence and testimony regarding the existence of a valid, legally enforceable contract.

## A. The Terms of any Putative Contract in this Matter are Insufficiently Definite to Offer the Availability of Summary Judgment on Both Parties' Contract-Based Claims

In this matter, Pennsylvania law applies in determining the existence and nature of a contract. Furthermore, because the business relationship involved primarily the provision of expert services, the UCC would not directly govern the parties' relationship.

Obviously, in order to establish a claim for breach of contract, a party must first show the existence of a valid contract; as a preliminary matter, two essential aspects of a valid contract must be satisfied: first, the parties must demonstrate that they exhibited the intent to enter into a contractual relationship, and second, the parties must show that the terms of the contract are reasonably certain. To be legally certain, the contractual terms must provide a Court with some type of reasonable basis to determine the existence of a breach and provide an appropriate remedy. *See* Restatement Second, Contracts § 33.

In considering the proffered evidence in light of this fundamental requirement that any contract must contain terms of sufficient definiteness such that a Court may reasonably interpret those terms, the Court finds that it cannot reasonably interpret and apply those terms in an effort to

---

[1]However, the term contract is a legal term of art, defined to be "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." (Black's Law Dictionary, 7th Ed.).

assess breach. Specifically, in this matter, the various contractual allegations, and the evidence supplied by the parties, simply do not combine in any manageable manner to allow the Court to reasonably determine, at the summary judgment stage, the parameters or impact of terms of any legally enforceable agreement that may exist between the parties.

At its heart, the proposed economic relationship between the parties centered upon the 4 books that were to be produced within a year. Essentially all of the secondary terms discussed by the parties revolve around this essential matter: that four books were to be published by Aegis pursuant to manuscripts provided by AUSA. Unfortunately, though, despite the all-important nature of this term, the Court simply does not have sufficient uncontroverted evidence to make a legally valid assessment of the circumference of this term. In other words, as phrased in the applicable language of the summary judgment standard, genuine issues of material fact exist as to the nature and parameters of this central term, with numerous extant disputes regarding the informal and formal discussions between the parties that would define the content of this term. In short, many such disputes will need to be resolved by the trier of fact prior to the Court's determination of whether a legally enforceable contract actually exists.

As established by the evidence before the Court at this summary adjudication stage, the parties conducted numerous discussions about the type of books that would be pursued under their business relationship. However, the Court understands the parties' filings to show that much of the discussions were broad, long-term plans regarding numerous books and business strategies; as to the specific four books at issue, it appears that such discussions were of insufficient detail to allow this Court to make a proper judicial assessment as to the actual nature of those terms, at least at the summary adjudication stage. For instance, while Aegis argues that a letter from AUSA confirmed

12

the types of books that were anticipated, the Court interprets the letter to speak primarily to generalized categories, and it appears to speak in a long-term perspective.

This vagueness of terms presents the fundamental jurisprudential obstacle in granting either party its requested relief: the Court finds it impossible, at this stage and on the evidence before it, to construe or understand the putative contractual terms.

The parties' briefing largely skips this important threshold issue in part because it is essentially undisputed by them that they intended to enter into a legally enforceable agreement. However, the parties ignore that such intent, alone, is not wholly dispositive regarding contract formation. Rather, the law can only legitimately enforce an agreement if the terms of such an agreement are ascertainable.

The Court will now discuss briefly some aspects of the terms as related to their indefiniteness. Obviously, to facilitate accomplishment of the publishing purpose, AUSA advanced $50,000 to Aegis; this objective and undisputed fact speaks strongly as to the parties' intent; however, it does not help the Court as to definiteness of the term. Importantly, admissible evidence appears to show that one of the parties' memorialized written criterion for establishing which four books would be published was the "future agreement of the parties." This term includes no real, undisputed guidance as to the precise content, style, source, or conditions of such books. In essence, despite the various conclusory pronouncements of the parties, when viewed in light of the summary judgment standard with respect to refraining from resolving factual disputes, and resolving such disputes in favor of the non-movant, the only real conclusion that the Court can draw is that this term presents nothing more than an agreement to agree as to the books to be published.

Where an essential element to an agreement is reserved for future agreement of both parties,

13

the promise does not give rise to a legal obligation until such future agreement. *See Dahar v. Grzandziel*, 599 A.2d 217 (Pa. Super. Ct. 1991). The problem with such indefinite terms, from a judicial perspective, is that they do not allow the Court to properly interpret and apply the applicable law to the unambiguous facts. *See In re Friese's Estate*, 9A.2d 401 (Pa. 1939). Furthermore, judicial guessing as to the likely scope of such terms does not promote party, societal or jurisprudential interests. Therefore it is simply not possible for the law to enforce any obligation related to the "agreement to agree." Where a Court finds that a term is so indefinite that it is unable to determine whether the contract was actually performed, the Court must revert to the finding that no contract existed in the first place. *Reed v. Pittsburgh Bd. of Public Educ.*, 862 A.2d 131 (Pa. Commw. Ct. 2004).

An equally problematic aspect of such agreements is that during their tenure, either party, if disaffected, may simply refuse to agree to anything to which the other party will agree. *See In re Vylene Enterprises, Inc.*, 90 F.3d 1472 (9th Cir. 1996) (explaining that where either party by terms of promise may refuse to agree to anything to which other party will agree, it is impossible for law to affix any obligation to such promise). While the facts are not undisputed, and thus do not constitute a basis for summary adjudication, this policy rationale requiring definite terms appears to be relevant to this matter. As the parties' relationship deteriorated, AUSA may have deliberately held back desirable books. Mr. Cirillo stated that the "German books were deliberately kept off the table because [Aegis] had no cash flow." *See* Dep. of R. Cirillo, p. 209.

A vital question, then, is whether those referenced books that were held back were part of a term of a legally enforceable contract; at this stage, this question is unanswerable. While Mr. Cirillo's comment suggests the possibility of bad faith, it more specifically shows that the terms of

14

the agreement were hopelessly indefinite. As discussed previously, a Court typically cannot intelligently enforce a contract where the parties have left material term for future negotiations. *See Rule v. Brine, Inc.*, 85 F. 3d 1002 (2d Cir. 1996). On the one hand, the holding back of desirable books could be seen as a bad faith breach; however, such determination would be wholly conjectural at this stage, because of the indefiniteness of the terms of the contract that describe the 4-book arrangement. In other words, as to the dispute regarding provision of manuscripts, the parties seem to be at loggerheads regarding the identity of the four books; unhelpfully, of course, the contract does not specify the intended books.

In the Court's mind, then, the precise books were a matter explicitly left by the parties to future negotiations, and the actual events therein cannot actually be assessed in terms of performance or lack thereof of a contractual term. Aegis argues that AUSA's decision to only provide Korean War volumes was a clear breach of AUSA's contractual obligations. Doc. No. 61, p. 8. The Court agrees that AUSA's providing only low-potential manuscripts was not the initial plan of the parties. However, AUSA's "unilateral" decision may have been its right, given that the parties' initial agreement did not establish which books would be provided. The determination of those books was left to future negotiations; simply because those negotiations went poorly for Aegis does not necessarily mean that AUSA "materially change[d] the contract." Doc. No. 61, p. 8. In short, while AUSA may indeed have given Aegis "bad" books, a business reality is that when not tied into a specific contract, companies pursue business opportunities with the most attractive partners. Perhaps, absent a contract with sufficiently definite terms, Aegis may not be able to succeed upon contractual remedies, simply because it was left behind as an unattractive partner. Coming out on the empty end of additional business negotiations does not entitle one to petition the court for a

15

remedy. Nonetheless, reading anything effectual into these comments will ultimately depend upon resolution of disputed issues of fact at the trial stage in this matter.

Thus, in one sense, the seemingly harried and contentious course of events that occurred after the parties' initial discussions provides confirming evidence of the uncertainty in the parties' own understanding of the putative terms applicable to their relationship; additionally, the Court also notes that comparing the parties' assertions regarding the contract to a hypothetical ideal contract in a similar business setting highlights the damning indefiniteness in the parties' asserted putative contract. A proper book publishing contract, for which an advance of a sum certain would be given, should obviously define the precise books, or at least some neutral and workable governing criteria for determining whether such books would qualify. In the enterprise in which the parties were involved, the nature of the book, its quality, and its subject matter, are the determinative factors in terms of the success of the book and the ultimate success of the parties. An agreement where the term defining the intended book, obviously the most key term, is left without adequate description or bounds, essentially asks for problems.

While in the substantial time since the deterioration in their relationship, the parties have continually beat the war drums about contract and breach, the true source of problem in this matter is the absence of an intelligently drafted, predictive, and legally valid contract. Without a guiding contract, parties are left to navigate only by their self-interest; under such circumstances, any deterioration in relationship establishes cover for a one-sided re-interpretation of an indefinite term. At least at the summary judgment stage, it is not judicially appropriate for a Court to step in and offer post-hac adjudication of a deteriorated business relationship, by applying overly indefinite standards, even in a situation such as the one presented here where the parties invite the Court to act.

16

Furthermore, briefly reviewing additional easily understood contractual principles sheds more light upon the terms' indefiniteness and the corresponding inability of this Court to provide summary adjudication. For instance, leases that leave renewal rent for future agreement are often held unenforceable for indefiniteness and uncertainty. Admittedly, in recent times, some courts applying analogous UCC provisions may set reasonable rent; however, in a lease setting, easily definable standards are available to the Court. However, in this matter, especially at the summary judgment stage wherein disputed facts are not weighted and resolved, and given the specialized nature of the work involved, this Court simply cannot make up what types of reasonable books that AUSA should have provided; in other words, the UCC approach of substituting a reasonable price simply does not analogize well. Quite simply, in matters of interpreting vague contracts, this Court is neither willing nor able to pore over thousands of pages of emails in search of evidence that might provide support for one position over another.

In likely anticipation of this judicial dilemma, the parties attempt to present various forms of extra-contractual proof as to the nature of the agreement between Messrs. Cirillo and Bonn as relating to these four books. However, their inability to agree, even in retrospect, confirms that at the general time period of the Outline/MOU, the parties agreed only to a deal for four books to be agreed upon later. Upon review during summary judgment analysis, this Court finds that as a matter of law, such an agreement is unenforceable for indefiniteness of the central term.

In short, for summary judgment purposes, after careful review of all of the available arguments and evidence, this Court concludes that the parties did not enter into a legally enforceable agreement. Because the proffered terms are so indefinite that the Court cannot make a reasonable and fair determination breach, the Court obviously cannot grant a summary contractual remedy.

17

When this matter is presented for trial, the weighing of admissible evidence may enable the trier of fact to arrive at a firmer idea of the proper scope of the central term of the contract; under such a scenario, the Court's present limitations may disappear and upon a determination of breach, contractual remedies may be available.

Another matter to consider briefly is whether the indefiniteness in the term regarding which four books necessarily limits summary adjudication of other contractual aspects of the parties' agreement. The issue of severability of agreement terms "depends upon its relative importance and its severability from the remainder of the contract." Restatement Second, Contracts § 33, comment f, illustration 11. As noted above, the publishing deal for the four books appears to the Court to be the central part of the contract; consequently, at least at the summary judgment stage, the Court is unwilling to grant summary adjudication on any other peripheral agreements.

### B. Summary Judgment as to the Parties' Non-Contract Claims is Also Not Appropriate

As to the parties' non-contract claims, the Court also finds that numerous disputed issues of fact preclude any entry of summary judgment. Furthermore, the proper resolution of such claims will likely flow directly from the conclusions of the Court and the jury as to the contract-based claims. Consequently, the parties' requests for summary judgment on all claims and counterclaims, including unjust enrichment, promissory estoppel, conversion, unfair competition, trademark, fraudulent misrepresentation, and breach of the implied covenant of good faith and fair dealing, are denied. The Court will issue a pretrial order. The Court will, at a later date, set a schedule for the filing of pre-trial memoranda, in which the parties are encouraged to narrow the issues in dispute. This may permit the Court, if appropriate, to adjudicate some of the non-contract claims so as to facilitate a compact and focused trial; still, the Court, as noted above, suspects that it may be necessary to

18

suspend adjudication of such claims until after resolution of the pending contract issues.

**VI. Conclusion**

As an important note, the Court reminds the parties that its above commentary on the issues present in this matter was constructed for the purpose of assessing whether summary judgment was appropriate. As the parties and all first-year law students well understand, summary judgment is an extraordinary remedy, and is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In this matter, the Court found that numerous genuine issues of material fact remained, with such issues requiring resolution at the trial stage. Furthermore, the undisputed facts, taken alternatively in favor of each non-movant with respect to each motion for summary judgment, wholly precluded an entry of summary judgment. Consequently, both parties' motions for summary judgment will be **DENIED.** An appropriate order follows, reflecting the Court's denial of the parties' motions for summary judgment. The Court will issue a separate pretrial order shortly, setting a schedule for trial and vital pretrial memoranda and briefing.

**ORDER**

AND NOW, this 30th day of September, 2009, this matter coming before the Court on the parties' cross-motions for summary judgment, including Defendants' Motion for Summary Judgment (Doc. No. 40), and Plaintiff's Motion for Summary Judgment (Doc. No. 57), **IT IS HEREBY ORDERED THAT BOTH MOTIONS ARE DENIED.**

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

20